1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CRISTIAN DOE, DIANA DOE,<br><br>                    Petitioners-Plaintiffs,<br><br>v.<br><br>CHAD F. WOLF, Acting Secretary of<br>Homeland Security; et al.,<br><br>                    Respondents-Defendants. | Case No.:  19-cv-2119-DMS (AGS)<br><br>**ORDER GRANTING MOTION FOR<br>CLASSWIDE PRELIMINARY<br>INJUNCTION** |

On November 5, 2019, Petitioners filed a motion for class certification and a motion for temporary restraining order ("TRO") to allow Petitioners access to their retained counsel prior to and during Petitioners' non-*refoulement* interviews under the Government's Migrant Protection Protocols Program ("MPP" or "Remain in Mexico"). Pursuant to the MPP, asylum seekers arriving at the United States Border by land from Mexico are returned to Mexico to await the outcome of their immigration proceedings. Bound by the duty of non-*refoulement*, however, Respondents may not return an asylum seeker to Mexico if the individual can show he or she faces persecution or torture in Mexico.  Instead, the asylum seeker is taken out of the MPP and paroled or detained in the United States to await their removal proceedings.

1

On November 12, 2019, the Court granted Petitioners' motion for TRO and ordered Respondents to allow Petitioners access to their retained counsel prior to and during their non-*refoulement* interviews. *Doe v. McAleenan*, --- F. Supp. 3d ---, 2019 WL 6605880, at *5 (S.D. Cal. Nov. 12, 2019). Petitioner Cristian Doe was interviewed two days later by an U.S. Citizenship and Immigration Services ("USCIS") Asylum Officer. Three attorneys for Doe were present telephonically. The Asylum Officer found it is more likely than not that Petitioners will be persecuted or tortured if they are returned to Mexico. Consequently, the Doe family was taken out of the MPP and released from Customs and Border Patrol ("CBP") custody. They are still awaiting the remainder of their immigration case.

The Court has certified a class action to include similarly situated asylum seekers. Petitioners now request classwide injunctive relief to allow for access to retained counsel prior to and during their non-*refoulement* interviews. The matter has been fully briefed and argued. For the reasons set forth below, the Court reaffirms its conclusion that Petitioners have met their burden and that the Administrative Procedures Act ("APA"), specifically 5 U.S.C. § 555(b), provides a right to retained counsel in these circumstances.

# I.

# BACKGROUND

Petitioners' and Respondents' declarations provide the following background facts. Petitioners are the parents of a family of five children that fled their home country of Guatemala after suffering extortion, death threats, and rape. (Mot. for TRO, Declaration of Cristian Doe ("Cristian Doe Decl."), at ¶¶ 2, 4). Like many families, Petitioners traveled through Mexico to seek asylum in the United States. (*Id.* at ¶ 7). While in Mexico, Petitioners and their children were threatened at gun point, assaulted, robbed, and stripped of their clothing. (Mot. for TRO at 14). Their attackers, masked men clothed in what appeared to be Mexican government uniforms, threatened to kill Petitioners if they reported the incident. (*Id.*). Petitioners and their children were left terrified. (*Id.*). Upon reaching the United States, Petitioners immediately requested asylum. (*Id.*).

Prior to the MPP, asylum seekers arriving at the Southern border were usually placed in expedited removal proceedings. 8 U.S.C. § 1225(b)(1). If they expressed a fear of persecution or torture upon removal to their country of origin, the asylum seekers were given a credible fear interview ("CFI") to determine whether there was a significant possibility they would establish eligibility for asylum. 8 U.S.C. § 1225(b)(1)(A)(i). Before such interviews, asylum seekers had a right to consult with counsel. 8 C.F.R. §§ 208.30(d), 208.31(c). If the asylum seekers passed their CFIs, they were placed in full removal proceedings before an Immigration Judge ("IJ") to present their asylum claims. 8 U.S.C. §§ 1229a(c)(4), 1225(b)(1)(B)(ii); 8 C.F.R. §§ 208.30, 235.3. While awaiting their removal proceedings, the asylum seekers were often paroled into the United States.

The process changed in January of 2019 when the Department of Homeland Security ("DHS") instituted the MPP: "an unprecedented action" meant to "address the urgent humanitarian and security crisis at the Southern border." (Resp. in Opp'n to TRO, Ex. 2 at 4). Pursuant to the MPP, "individuals arriving in or entering the United States from Mexico—illegally or without proper documentation—may be returned to Mexico for the duration of their immigration proceedings." (*Id.*, Ex. 1 at 1). Asylum seekers within the MPP are given "Notice[s] to Appear" for their immigration court hearings and await such hearings in Mexico. (*Id.* at 2). In effect, the MPP replaces expedited removal proceedings and CFIs for certain asylum seekers. (*Id.*, Ex. 2 at 7). The MPP is authorized by the Immigration and Nationality Act ("INA"), which provides that asylum seekers "arriving on land . . . from a foreign territory contiguous to the United States" may be returned "to that territory pending [their immigration] proceeding[s.]" 8 U.S.C. § 1225(b)(2)(C).

In implementing the MPP, DHS officials must act consistent with the principle of non-*refoulement*. (Resp. in Opp'n to TRO, Ex. 3 at 11). This principle, contained in both Article 33 of the 1951 Convention Relating to the Status of Refugees[1] and Article 3 of the

---

[1] July 28, 1951, 189 U.N.T.S. 150.

Convention Against Torture,[2] prohibits the return of an individual to a country in which he or she would more likely than not be persecuted or tortured.  (*Id.* at 10–11).  As applied to the MPP, asylum seekers must first express a fear of returning to Mexico, and those that do are then detained by CBP pending a non-*refoulement* interview with USCIS Asylum Officers.  (*Id.* at 11 n.4).  During this interview, the Asylum Officer "elicit[s] all relevant and useful information" regarding the likelihood the asylum seeker will face persecution and torture upon his or her return to Mexico.  (*Id.*, Ex. 4 at 15).  The interview "can last up to several hours, during which time the [asylum seeker] is often handcuffed."  (Mot. for TRO at 16; Cristian Doe Decl. at ¶¶ 25–26).  If the asylum seeker passes the non-*refoulement* interview, he or she is removed from the MPP and is either released on parole or detained in the United States pending removal proceedings.  (Mot. for TRO at 17).  If the asylum seeker does not pass, he or she must await the outcome of their removal proceedings in Mexico. (*Id.*).

Pursuant to DHS policy, asylum seekers cannot communicate with retained counsel prior to or during non-*refoulement* interviews.[3]  In practice, asylum seekers are given sporadic access to counsel—prior to their interviews, asylum seekers may have monitored calls with their attorneys if the phones are working, and during their interviews, asylum seekers are "sometimes" given access to counsel "on an ad hoc basis."  (*Id.* at 18; Resp. in Opp'n to Prelim. Inj., Declaration of Ashley B. Caudill-Mirillo ("Caudill-Mirillo Decl."), at ¶ 3).  DHS maintains, however, that providing asylum seekers with access to retained counsel is not required by law.  (Resp. in Opp'n to Prelim. Inj. at 18–19).

---

[2] Dec. 10, 1984, 1465 U.N.T.S. 85.

[3] USCIS states in its *Policy Memorandum* concerning the implementation of the MPP, "[P]rovided the [non-*refoulement* interviews] are part of either primary or secondary inspection, DHS is currently unable to provide access to counsel during the [interviews] given the limited capacity and resources at ports-of-entry and Border Patrol stations as well as the need for orderly and efficient processing of individuals."  (Resp. in Opp'n to TRO, Ex. 4 at 15).  USCIS does not state in writing whether there is a right to access retained counsel if the interview occurs outside of primary or secondary inspection.

In accordance with the MPP, Petitioners and their children were returned to Mexico to await their immigration proceedings.  (Mot. for TRO at 14).  At their first immigration court hearing, Petitioners articulated a fear of return to Mexico and were given separate non-*refoulement* interviews.  They did not have counsel present.  (Caudill-Mirillo Decl. at ¶ 5; Cristian Doe Decl. at ¶ 26; Rep. in Supp. of Mot. for Prelim. Inj. at 9).  Petitioners did not pass their interviews and were returned to Mexico.  (Caudill-Mirillo Decl. at ¶ 5).  Petitioners again articulated their fear of returning to Mexico at their third immigration court hearing, in which retained counsel was present.  (Mot. for TRO at 19).  The family was then detained by CBP to await a second non-*refoulement* interview.  (*Id.*).  Petitioners were not given confidential access to retained counsel.  (*Id.*)

Petitioners filed suit the same day on which they expressed a fear of returning to Mexico in immigration court.  Petitioners sought a temporary restraining order to enjoin Respondents from prohibiting access to retained counsel and moved for class certification. The Court granted Petitioners' motion for a temporary restraining order and thereafter certified the class.  The Court now determines whether Petitioners are entitled to a classwide preliminary injunction that requires Respondents to provide asylum seekers access to retained counsel prior to and during non-*refoulement* interviews.

## II.

## DISCUSSION

Before addressing the merits of injunctive relief, the Court considers Respondents' jurisdictional arguments, including that the INA forecloses judicial review of Petitioners' claims and that the rule of non-inquiry bars judicial review of non-*refoulement* procedures. The INA prohibits judicial review of a "decision or action" that is "in the discretion of the Attorney General or the Secretary of Homeland Security."  8 U.S.C. § 1252(a)(2)(B)(ii). Respondents assert this jurisdictional bar extends not only to decisions to return asylum seekers to Mexico pending removal proceedings—which this case does not concern—but also extends to "the procedures used to arrive at those decisions."  (Resp. in Opp'n to Prelim. Inj. at 13).  In support, Respondents cite *Gebhardt v. Nielsen*, in which the Ninth

5

Circuit held it did not have jurisdiction to review the plaintiff's statutory claim attacking the USCIS's denial of his I-130 petition because of the INA's jurisdictional bar. *Gebhardt v. Nielsen*, 879 F.3d 980, 987 (9th Cir. 2018). In that case, the Ninth Circuit noted that it did not matter whether the plaintiff "characterize[d] his claims as challenges to the substantive standards that the Secretary [of DHS] use[d]" or as challenges to the Secretary's ultimate decision. *Id.* Either way, the Court lacked jurisdiction to review the claim because "[t]he standards by which the Secretary reaches a decision within his or her 'sole and unreviewable discretion'—and the methods by which the Secretary adopts those standards—are just as unreviewable as the Secretary's ultimate decisions themselves." *Id.* (citing *Ortiz v. Meissner*, 179 F.3d 718, 722 (9th Cir. 1999)). Respondents argue the same logic applies here: Petitioners' claims attack "the procedures used to arrive at the ultimate decisions to return [asylum seekers] to Mexico" and those procedures are not subject to judicial review. (Resp. in Opp'n to Prelim. Inj. at 14).

Respondents' argument distorts Petitioners' claim. Petitioners are not challenging Respondents' decisions to return asylum seekers to Mexico or the substantive standards used to determine whether an asylum seeker will face persecution or torture upon return to Mexico. Petitioners' claim is narrow in its attack on Respondents' policy prohibiting access to retained counsel prior to and during non-*refoulement* interviews—an issue that is collateral to the outcome of the interview, and therefore within the Court's jurisdiction. *See Gebhardt*, 879 F.3d at 987 ("[W]e can review a claim in this context only if it challenges a genuinely *collateral* action") (emphasis in original); *Hernandez v. Sessions*, 872 F.3d 976, 988 (9th Cir. 2017) ("[Section] 1252(a)(2)(B)(ii) restricts jurisdiction *only* with respect to the executive's exercise of discretion."); *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 31 (D.D.C. 2019) ("[S]ection 1252(a)(2)(B)(ii) relates to judicial review of 'denials of discretionary relief[,]' . . . and nothing about Plaintiffs' claims challenges *relief* at all, much less discretionary relief or denials thereof.") (internal citations omitted). To hold otherwise, as Petitioners argue, would be to grant Respondents the unreviewable freedom to determine the results of non-*refoulement* interviews with a "Ouija board" or

"prevent persons from speaking" or "bind and gag" asylum seekers during the interview. (Rep. in Supp. of Mot. for Prelim. Inj. at 3). The Court, therefore, has jurisdiction over Petitioners' claim.

As to Respondents' argument that the rule of non-inquiry bars judicial review of Petitioners' claim, the Court reaffirms its conclusion that the rule of non-inquiry does not apply because Petitioners are not challenging extradition or return decisions. (Order Granting TRO at 5–6 n.2). Petitioners seek to vindicate rights provided to them under federal law, specifically the APA, and do not seek relief under the Convention Against Torture or any extradition statute.

With these findings, the Court considers whether Petitioners are entitled to a classwide preliminary injunction. Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the [petitioner] is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To meet that showing, Petitioners must demonstrate " '[they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.' " *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). Petitioners have met each factor.

## A. Likelihood of Success

"The first factor under Winter is the most important—likely success on the merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). While Petitioners carry the burden of demonstrating likelihood of success, they are not required to prove their case in full at the preliminary injunction stage but only such portions that enable them to obtain the injunctive relief they seek. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

As explained in the Order granting Petitioners' motion for TRO, Petitioners contend they are likely to succeed on the merits because 5 U.S.C. § 555(b) provides asylum seekers the right to access counsel of their choice prior to and during non-*refoulement* interviews. Petitioners argue that because the INA does not contain any statutory provision concerning access to retained counsel and non-*refoulement* interviews, the APA provision providing

such access remains in effect.  *See* 5 U.S.C. § 559 ("Subsequent statute may not be held to supersede or modify [the APA's protection of the right to access of retained counsel], except to the extent that it does so expressly.").  Respondents argue § 555(b) of the APA does not apply in *any* immigration proceeding, the INA provides no right to access retained counsel prior to or during non-*refoulement* interviews, non-*refoulement* interviews occur during primary and secondary inspections, and finally, even if the INA did not supplant the APA here, § 555(b) does not apply.  The Court addresses these arguments in turn.

In opposition to the preliminary injunction, Respondents revive their argument that two Supreme Court cases, *Ardestani v. Immigration and Naturalization Service* and *Marcello v. Bonds*, hold the INA displaces the APA in all "immigration proceedings"—immigration being broadly defined.  *Ardestani v. INS*, 502 U.S. 219 (1991); *Marcello v. Bonds*, 349 U.S. 302 (1955).  The Court reaffirms its previous decision: neither case stands for the proposition Respondents proffer.  The Supreme Court held in *Marcello* that § 242(b) of the INA, the precursor to the modern removal proceeding statute, 8 U.S.C. § 1229a, supplants the APA as the "sole and exclusive procedure for deportation proceedings." *Marcello*, 349 U.S. at 310.  Relying on its decision in *Marcello*, the Supreme Court held in *Ardestani* that deportation proceedings are not within the scope of the Equal Access to Justice Act ("EAJA") because "deportation proceeding[s] [are] not subject to the APA." *Ardestani*, 502 U.S. at 134.  Both cases emphasize the INA's "laborious adaptation of the [APA] to the deportation process" and the INA's language asserting that it "shall be the *sole* and *exclusive* procedure for deportation proceedings." *Id.* at 134 (quoting *Marcello*, 349 U.S. at 310).  Distilled to their core holdings, both cases concern solely deportation proceedings, not *all* immigration proceedings.

The problem is the Supreme Court's language in *Ardestani* is not specific.  In stating the question before the Court, the Court writes: "We now consider whether the EAJA authorizes the award of attorney's fees and costs for administrative *deportation proceedings* before the INS." *Id.* at 131 (emphasis added).  The Court later replaces the phrase 'deportation proceedings' with 'immigration proceedings' and states: "Although

immigration proceedings are required by statute to be determined on the record after a hearing  . . . , we previously have decided that they are not governed by the APA." *Id.* at 132 (citing *Marcello*, 349 U.S. 302).  We know, however, that not *all* immigration proceedings 'are required by statute to be determined on the record after a hearing.'  The immigration proceeding at issue here, a non-*refoulement* interview, is undeniably not determined on the record after a hearing.  (Resp. in Opp'n to TRO, Ex. 4 at 15–16).  Do we take the Supreme Court's language to mean that *all* immigration proceedings must be determined on the record after a hearing?  Or, do we understand the Supreme Court's language to concern the narrower category of deportation proceedings?  The Court finds the latter, most importantly because the Supreme Court's decision in *Marcello* requires such an interpretation.  In comparison, there is no Supreme Court precedent holding the INA supplants the APA in *all* immigration proceedings.

Respondents argue the Court's reading of these two cases is not correct, for if it was, then § 555(b) of the APA would necessarily extend to expedited removal proceedings.  (*Id.* at 17).  Respondents contend this cannot be right because "courts have repeatedly and unequivocally concluded the APA right-to-counsel provision does not govern expedited removal proceedings."  (*Id.* at 17 (citing *United States v. Barajas*, 655 F.3d 1077, 1088 (9th Cir. 2011); *United States v. Quinteros Guzman*, No. 3:18-cr-00031-001, 2019 WL 3220576, at *10 (W.D. Va. July 17, 2019))).  Respondents' argument is a non sequitur because expedited removal proceedings and non-*refoulement* interviews are not comparable immigration proceedings. The INA provision concerning expedited removal proceedings is complex, specialized, and specific to expedited removal proceedings.  *See* 8 U.S.C. § 1225.  The INA contains no provision concerning non-*refoulement* interviews. This difference is crucial in this context: the INA's expedited removal proceeding provision supersedes the APA, whereas the INA's lack of mention of non-*refoulement* interview does not.  *See* 5 U.S.C. § 559 ("Subsequent statute may not be held to supersede or modify [the APA's protection of the right to access of retained counsel], except to the extent that it does so expressly."); *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)

("It is our duty to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section, as the Government's interpretation requires) (internal quotation omitted); *Barajas,* 655 F.3d at 1088 ("The cases cited by [the plaintiff] involve aliens in the more formal removal proceedings, where the regulations provide a right of counsel, as compared to expedited removal proceedings, where they do not."); *Kim v. Ashcroft*, 340 F. Supp. 2d 384, 393 (S.D.N.Y. 2004) ("[A]lthough there is no statutory or regulatory deadline by which [Citizenship and Immigration Services] *must* adjudicate an application, at some point, defendants' failure to take any action runs afoul of section 555(b) [of the APA]").  Holding the INA fails to supplant the APA for non-*refoulement* interview procedures says nothing about whether the INA supplants the APA for expedited removal proceedings.

Next, Respondents argue the INA does not provide a right to access retained counsel prior to and during non-*refoulement* interviews.  Although Respondents agree there is "no statutory or regulatory provision" addressing the issue, Respondents contend that this silence buttresses their conclusion that the INA does not provide for a right to access retained counsel.  (Resp. in Opp'n to Prelim. Inj. at 18).  Respondents cite the Ninth Circuit's decision in *Barajas* in support of their argument.  In that case, the court held that aliens do not have a right to counsel in expedited removal proceedings because the expedited removal proceeding provision of the INA does not provide for one, unlike the formal removal proceeding provision, which does.  *Barajas*, 655 F.3d at 1088. Respondents argue the same logic applies here.  The INA is silent on whether asylum seekers may access retained counsel prior to and during non-*refoulement* interviews, whereas the INA provides access to retained counsel prior to CFIs and during formal removal proceedings.  Therefore, Respondents argue, the INA does not provide asylum seekers access to retained counsel in the non-*refoulement* interview context.

Respondents' argument is not persuasive.  It is impossible to evince from the INA whether there is a right to counsel in non-*refoulement* interviews because the INA does not

mention non-*refoulement* interviews at all.[4]  In *Barajas*, the court's reasoning necessarily depends on Congressional consideration of both expedited removal proceedings and formal removal proceedings. *Barajas*, 655 F.3d at 1088 ("The cases cited by [the plaintiff] involve aliens in the more formal removal proceedings, where the regulations provide a right of counsel, as compared to expedited removal proceedings, where they do not."); *see also* 8 C.F.R. § 287.3 ("Except in the case of an alien subject to the expedited removal provisions of section 235(b)(1)(A) of the Act, an alien arrested without warrant and placed in formal proceedings under section 238 or 240 of the Act will be advised of . . . the right to be represented at no expense of the Government."). Here, there is no such Congressional consideration.  Therefore, the Court stands by its prior conclusion that the INA does not foreclose asylum seekers the right to access retained counsel prior to and during non-*refoulement* interviews.

Respondents also argue the regulation prohibiting individuals from accessing retained counsel during primary and secondary inspection precludes the Court's conclusion

---

[4] At oral argument, counsel for Respondents argued the INA's provision concerning the return of asylum seekers to contiguous territories pending their immigration proceedings constitutes a statutory provision concerning non-*refoulement* interviews. (Rep. Tr. (Draft) at 19–20, Dec. 20, 2019); *See* 8 U.S.C. § 1225(b)(2)(c).  Respondents asked the Court to compare § 1225(b)(2)(c) to § 1225(b)(1)(B)(iv), which provides for the right to consult with counsel prior to a CFI.  Respondents argued that the INA's mention of a right to consult counsel prior to CFIs and its lack of mention of a right to access counsel in non-*refoulement* interviews indicates there is no right to counsel in the latter immigration proceeding.  There is one major problem with this argument: § 1225(b)(2)(c) says nothing about the duty of non-*refoulement* or the mechanisms by which Respondents comply with this obligation.  It is textually inappropriate to consider § 1225(b)(2)(c) a provision that concerns non-*refoulement* interviews whatsoever. If Respondents' argument were true and § 1225(b)(2)(c) concerned the procedures of a non-*refoulement* interview, then, by extension, the lack of mention of non-*refoulement* interviews in comparison to the detailed procedures of a CFI could be used to argue Congress did not intend for there to be a duty of non-*refoulement* altogether.  Yet, we know this not to be true.  *See* Article 33 of the 1951 Convention Relating to the Status of Refugees; Article 3 of the Convention Against Torture.  Respondents' argument is not textually sound.

that § 555(b) of the APA applies to non-*refoulement* interviews.  (Resp. in Opp'n to Prelim. Inj. at 19).    Respondents cite the USCIS's *Policy Memorandum* concerning the implementation of the MPP, which states: "[P]rovided the MPP assessments are part of either primary or secondary inspection, DHS is currently unable to provide access to counsel during the assessments given the limited capacity and resources at the ports-of-entry and Border Patrol stations as well as the need for the orderly and efficient processing of individuals."  (Resp. in Opp'n to TRO, Ex. 4, at 15).  Respondents argue that, at the very least, the regulation forecloses a right to access retained counsel if the non-*refoulement* interview occurs during primary or secondary inspection.

There are two problems with this argument.  First, there is no evidence that a non-*refoulement* interview has *ever* occurred during primary or secondary inspection. Respondents' declarations provide information concerning the number of individuals in the MPP and the number of individuals crossing the United States-Mexico border. (Resp. in Opp'n to Prelim. Inj., Declaration of Scott Garrett ("Garrett Decl."), at ¶ 8 ("Since [implementation of the MPP] San Diego Sector has processed approximately 6,200 cases through the program . . . .  El Centro Sector has also processed approximately 6,800 cases which includes aliens apprehended by Tucson Sector  . . . .  On November 21, 2019, there were approximately 190 individuals processed by Border Patrol who were scheduled to appear in immigration court."), Declaration of Mariza Marin ("Marin Decl."), at ¶ 27 ("For fiscal year 2019, through the end of August, the San Ysidro POE processed more than 11 million northbound pedestrians, more than 13 million northbound vehicles, and more than 34 million northbound travelers altogether . . . .   San Diego OFO has processed approximately 1,110 aliens pursuant to the MPP . . . .   While daily numbers vary, there were 224 individuals scheduled for their immigration court appearance, of which 116 showed up for transport to court.").  None of Respondents' declarations, however, state that non-*refoulement* interviews are, or ever have been, conducted during primary or secondary inspection.

12

In fact, Respondents' declarations lend themselves to conclude the opposite. "Generally, the MPP respondents are returned to Mexico within a day or two after encounter." (Marin Decl. at ¶ 17). If an asylum seeker were to articulate a fear of returning to Mexico before he or she is processed for MPP, the asylum seeker is referred to a USCIS Asylum Officer. (Resp. in Opp'n to TRO, Ex. 5 at 18–19 ("If an alien who is potentially amendable to MPP affirmatively states that he or she has a fear of persecution or torture in Mexico, or a fear of return to Mexico, whether before or after they are processed for MPP or other disposition, that alien will be referred to a USCIS asylum officer for screening . . . .")). It is clear that non-*refoulement* interviews do not occur within primary or secondary inspection. They are conducted in separate areas by an officer of a different agency at a later time. (*Id.*, Ex. 4 at 15 ("[T]he USCIS officer should conduct the MPP Assessment interview in a non-adversarial manner, separate and apart from the general public."); Cristian Doe Decl. at ¶ 17 ("After the court hearing we were returned to the [POE] before being transferred to another nearby cold holding cell. We were there for two or three days . . . ."). Respondents have provided no information stating otherwise.[5]

The second problem with Respondents' argument is that primary and secondary inspection and non-*refoulement* interviews are separate immigration proceedings with different purposes. In primary and secondary inspection, CBP officers "at the inspections booths . . . ensur[e] and facilitiat[e] lawful trade and travel, and prevent[] the introduction

---

[5] At oral argument, counsel for Respondents pointed to paragraphs 12 and 24 of the Marin Declaration in support of their argument that non-*refoulement* interviews occur during primary and secondary inspection. Paragraph 12 of the Marin Declaration states: "Amenable aliens arriving at the San Ysidro POE or Calexico POE are initially processed for MPP at the POE at which they attempted to enter the U.S." (Marin Decl. at ¶ 12). Paragraph 24 states: "Nor do the ports have the manpower to supervise MPP respondent visits, as most officers are at the inspection booths in primary and secondary inspection ensuring and facilitating lawful trade and travel, and preventing the introduction of contraband into the United States." (*Id.* at 24). Neither paragraph substantiates Respondents' claim.

of contraband into the United States." (Marin Decl. at ¶ 24); *see also Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 42 (D.D.C. 1998) ("During the primary inspection stage, the immigration officer literally has only a few seconds to examine documents, run basic lookout queries, and ask pertinent questions to determine admissibility and issue relevant entry documents."). During non-*refoulement* interviews, the USCIS Asylum Officer's purpose is to "elicit all relevant and useful information bearing on whether the alien would more likely than not face persecution on account of a protected ground, or torture, if the alien is returned to Mexico . . . ." (Resp. in Opp'n to TRO, Ex. 4, at 15). The Asylum Officer takes into account (1) the credibility of the asylum seeker's statements, (2) commitments from the Government of Mexico regarding treatment and protection of asylum seekers, and (3) whether the alien has engaged in criminal, persecutory, or terrorist activity. (*Id.* at 15–16). This fact intensive interview can last up to several hours. (Cristian Decl. at ¶¶ 25, 26). Although a non-*refoulement* interview may be conducted close in time and space to inspection, the two immigration proceedings are separate and different—the procedures of one do not extend to the procedures of another. Therefore, the regulation prohibiting right to counsel during primary and secondary inspection is irrelevant to the issue of whether there is such a right prior to and during non-*refoulement* interviews.

Finally, Respondents argue that even if the INA fails to supersede the APA, § 555(b) of the APA does not apply to non-*refoulement* interviews. (Resp. in Opp'n to Prelim. Inj. at 19–21). Section 555(b) contains two distinct provisions on access to retained counsel. The first provision states: "A person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative." 5 U.S.C. § 555(b). The second provision states: "A party is entitled to appear in person or by or with counsel or other duly qualified representative in an agency proceeding." *Id.* Respondents argue Petitioners are not " 'compelled to appear' at non-*refoulement* interviews" and non-*refoulement* interviews are not "agency proceedings." (Resp. in Opp'n to Prelim. Inj. at

20).  Because the Court finds the first provision of § 555(b) applies, it will not address the applicability of the second provision.

Prior to non-*refoulement* interviews, asylum seekers are detained in CBP custody. (Cristian Decl. at ¶¶ 2, 22).  During the interview, asylum seekers may be handcuffed. (Mot. for TRO, Declaration of A.V.D. ("AVD Decl."), at ¶ 27).  Although asylum seekers must articulate a fear of return to Mexico before non-*refoulement* interviews commence, they are not "elect[ing] to appear at their non-*refoulement* interviews."  (Res. in Opp'n to Prelim. Inj. at 20).  A non-*refoulement* interview is merely the next step in a long, multi-stage immigration process, and it is irrelevant to the applicability of § 555(b) whether or not Petitioners triggered that process. (*See* Resp. In Opp'n to TRO, Ex. 4 at 16).  To hold otherwise would suggest § 555(b) does not apply in workers' compensation hearings— hearings that are initiated by the same individuals claiming a right to counsel under § 555(b).  The Ninth Circuit has, however, held otherwise.  *See Smiley v. Dir. Office of Workers Comp. Programs*, 984 F.3d 278, 282 (9th Cir. 1993) ("[The plaintiff] had a statutory right to be advised and represented by counsel. 5 U.S.C.A. § 555(b).").  Given the circumstances in which the non-*refoulement* interview takes place, Petitioners are "compelled" to appear for the purposes of § 555(b).

The Court's conclusion that asylum seekers have a right to access retained counsel prior to and during non-*refoulement* interviews is required by the text of § 555(b) and § 559 of the APA.  Petitioners have established a likelihood of success on their statutory claim under the APA, 5 U.S.C. § 555(b).[6]

///

///

---

[6] In light of Petitioners' likelihood of success on their first claim for relief under the APA, the Court declines to address the balance of Petitioners' statutory and constitutional claims under the INA and the First and Fifth Amendments to the United States Constitution.  (*See* Class Action Compl. and Petition for Writ of Habeas Corpus, ECF No. 1, at 23–26).

15

**B. Irreparable Injury**

Turning to the next factor, Plaintiffs must show they are " 'likely to suffer irreparable harm in the absence of preliminary relief.' "  *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Winter*, 555 U.S. at 20).  Respondents argue Petitioners have not demonstrated an immediate threatened injury, but only a speculative injury.  (Resp. in Opp'n to Prelim. Inj. at 30).  Specifically, Respondents argue that Petitioners' showing is lacking because (1) they have not identified "any named class members who would suffer irreparable harm in the absence of injunctive relief, and (2) even if the unnamed, unidentified class members obtained the relief sought and were able to have [an] attorney present during their interview they could very well still nonetheless be returned to Mexico." (*Id.*).  Petitioners allege that without access to counsel, class members risk the irreparable harm of a non-reviewable, erroneous decision that forces them to return to Mexico to face persecution and torture.  (Mot. for TRO at 32–33).

Petitioners' declarations provide sufficient evidence to establish a likelihood of irreparable injury.  Petitioners' first non-*refoulement* interview, in which counsel was not present, resulted in a negative assessment of fear.  (Caudill-Mirillo Decl. at ¶ 5). Petitioners' second interview, in which counsel was present, resulted in a positive assessment of fear.  (*Id.* at ¶ 7).  Respondents suggest Petitioners provided the USCIS Asylum Officer with information concerning "additional threats" that occurred "between the first and second interview."  (*Id.*).  Petitioners' counsel, however, notes that during the interview, she "identif[ied] discrepancies with the interpretation and add[ed] to the record by eliciting important testimony from [Petitioner] Cristian Doe."  (Rep. in Supp. of Prelim. Inj., Declaration of Stephanie Blumberg ("Blumberg Decl."), at ¶ 5).  The presence of counsel was clearly helpful to Petitioner Cristian Doe in presenting his fear of return to Mexico.  Given the stakes of a non-*refoulement* interview—the return to a country in which one may face persecution and torture—and the interview's fact-intensive nature, it is undeniable that access to counsel is important.

The fact that some class members may still be returned to Mexico, despite having an attorney present during their non-*refoulement* interview, does not preclude a finding of irreparable injury. Petitioners "need not further show that the action sought to be enjoined is the exclusive cause of the injury." *M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2012). It is enough to find that injunctive relief will prevent additional suffering, persecution, and torture. *See Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (finding the plaintiff satisfied the irreparable injury element because the injunctive relief prevented "exacerbation of the current . . . situation and additional suffering"). In addition, deprivation of the right to retained counsel for an interview of this magnitude is an injury itself. Accordingly, the Court finds Petitioners have shown a likelihood of irreparable injury.

## C. Balance of Equities

"To obtain a preliminary injunction, a plaintiff must also demonstrate that 'the balance of equities tips in his favor.' " *Hernandez*, 872 F.3d at 995 (quoting *Winter*, 555 U.S. at 20). Respondents argue the balance of equities weighs against granting injunctive relief because "the Government will be required to comply with additional procedural prerequisites in numerous non-*refoulement* interviews in California going forward." (Resp. in Opp'n to Prelim. Inj. at 31). Respondents further contend that an injunction would threaten national security and hinder immigration officers from addressing "the flow of illegal immigration." (*Id.*). Respondents' declarations note the heightened security at border patrol stations, the border patrol's limited staff and space, and the likelihood of asylum seekers' counsel overhearing sensitive information. (*See* Garrett Decl. at ¶¶ 14–17; Marin Decl. at ¶¶ 21–24).

The balance of equities weighs in favor of granting the preliminary injunction, despite Respondents' allegations. Although Respondents will be required to comply with additional procedural requirements prior to and during non-*refoulement* interviews, those procedural requirements are required by federal law, specifically the APA. Respondents "cannot reasonably assert that [they are] harmed in any legally cognizable sense" by being

17

1  compelled to the follow the law.  *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983).

2  Furthermore, if injunctive relief is not granted, class members face the possibility of being

3  forced to return to Mexico to suffer persecution, torture, and potentially death.  The balance

4  of equities, therefore, favors preventing the violation of "requirements of federal law."

5  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).

6  **D. Public Interest**

7         The final factor for consideration is the public interest.  *See Hernandez*, 872 F.3d at

8  996 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) ("When, as

9  here, 'the impact of an injunction reaches beyond the parties, carrying with it a potential

10  for public consequences, the public interest will be relevant to whether the district court

11  grants the preliminary injunction.' "))  To obtain the requested relief, "[Petitioners] must

12  demonstrate that the public interest favors granting the injunction 'in light of [its] likely

13  consequences,' *i.e.*, 'consequences [that are not] too remote, insubstantial, or speculative

14  and [are] supported by evidence.' "      *Id.* (quoting *Stormans*, 586 F.3d at 1139).

15  Respondents contend that the "public interest favors the efficient administration of

16  immigration laws at the border" and thus, favors the Government.  (Resp. in Opp'n to

17  Prelim. Inj. at 31 (citing *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir.

18  2019)).

19         As explained in the Court's Order granting Petitioners' motion for TRO, the public

20  interest is served by allowing class members access to retained counsel prior to and during

21  non-*refoulement* interviews.   It would not be "in the public's interest to allow

22  [Respondents] . . . to violate the requirements of federal law, especially when there are not

23  adequate remedies available."  *Ariz. Dream Act Coal.*, 757 F.3d at 1069 (quoting

24  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)).  Federal law, specifically the

25  APA, requires class members to have access to retained counsel prior to and during non-

26  *refoulement* interviews.  Respondents have failed to demonstrate how complying with this

27  legal requirement will impede the efficient administration of immigration laws at the

28  border.  Furthermore, Respondents' argument that it lacks the staff and space required to

comply with the APA is not persuasive, for Respondents elected to implement the MPP and detain asylum seekers in CBP custody pending non-*refoulement* interviews.   As Petitioners note, Respondents "cannot bootstrap [their] choices into justifications for those choices."  (Rep. in Supp. of Prelim. Inj. at 8).  Therefore, the public's interest weighs in favor of granting injunctive relief.

**E.  In-Person Access**

In its Order granting Petitioners' motion for TRO, the Court asked the parties to address whether the APA's right to access retained counsel provided for in-person access or only telephonic access.  Respondents contend (1) Petitioners did not demand in-person access in their Complaint, (2) courts have upheld restrictions on defendants' communication with counsel within the Sixth Amendment context, and (3) § 555(b)'s right to be 'accompanied' does not extend to being represented in 'an agency proceeding.' (Resp. in Opp'n of Prelim. Inj. at 22).  Petitioners argue they expressly sought to enjoin Respondents from "preventing confidential visits" with class members in their Complaint, and therefore, demanded the appropriate relief from the outset.  (Class Action Compl. and Petition for Writ of Habeas Corpus, ECF No. 1, at 27).  Petitioners further argue it is assumed that § 555(b)'s right to counsel includes in-person access given the importance of face-to-face communication.  Neither party has provided case law concerning in-person, as opposed to telephonic, access to counsel within the context of § 555(b) of the APA.

Before considering the text of § 555(b), the Court must address whether Petitioners adequately raised the issue of in-person access to counsel in their Complaint.  It "is axiomatic that the complaint may not be amended by the briefs."  *Candor v. United States*, 1 F. Supp. 3d 1076, 1082 (S.D. Cal. 2014) (internal quotation omitted).  Petitioners' Complaint includes the word 'visit' nine times.  Petitioners allege that CBP does not "allow attorneys representing persons in its custody to visit such persons for the purpose of confidential legal advice," and CBP has "a policy and practice of denying requests for in-person visits or confidential telephonic communication with counsel at its holding facilities."  (Class Action Compl. and Petition for Writ of Habeas Corpus, ECF No. 1, at 9,

19

15).  Petitioners allege that as a result of CBP's policy, "lawyers are unable to locate, visit or make confidential phone calls with their clients."  (*Id.* at 16).  Petitioners also note that the common questions of law and fact as to all class members include "whether they are denied confidential visitation or communication with retained counsel."  (*Id.* at 21).  Finally, Petitioners' prayer for relief includes a request that the Court enjoin Defendants from "preventing confidential legal visits."  (*Id.* at 27).  Given Petitioners' allegations and requests of the Court in their Complaint, the Court finds the question of whether access to retained counsel includes in-person access is properly before the Court.

As noted above, § 555(b) of the APA contains two provisions providing access to retained counsel.  The Court has already found that the first provision applies to non-*refoulement* interviews.  This provision reads: "A person compelled to appear in person before an agency or representative thereof is entitled to be accompanied, represented, and advised by counsel or, if permitted by the agency, by other qualified representative."  5 U.S.C. § 555(b).  The pertinent word is "accompanied."  *Black's Law Dictionary* defines 'accompany' as "[t]o go along with" or "to attend."  *Black's Law Dictionary* (11th ed. 2019).  This definition suggests § 555(b) envisioned in-person access to counsel.  *See also United States v. McPhaul*, 617 F. Supp. 58, 59 (W.D.N.C. 1985) ("Under 5 U.S.C. § 555(b), there is a right to have counsel present whenever a person is compelled to appear.").  Although Petitioners have conceded telephonic access to counsel during the non-*refoulement* interviews is sufficient, Petitioners have maintained the need for in-person access prior to non-*refoulement* interviews.  (Rep. in Supp. of TRO at 3 n.2).  Therefore, given the text of § 555(b), class members are entitled to in-person access to retained counsel prior to their non-*refoulement* interviews.

## III.

## CONCLUSION AND ORDER

For these reasons, Petitioners' motion for classwide preliminary injunction is granted.  Respondents may not conduct class members' non-*refoulement* interviews

1  without first affording the interviewees access to their retained counsel both before and

2  during any such interview.

3          **IT IS SO ORDERED.**

4

5  Dated:  January 14, 2020

6

7                                          Hon. Dana M. Sabraw
                                           United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

19-cv-2119-DMS (AGS)